**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 11** |
| **MINERS OIL COMPANY, INC.** | ) | |
| | ) | |
| Debtor. | ) | **CASE NO.  11-72354** |

_____

<u>**MEMORANDUM DECISION**</u>

This decision recounts a cautionary tale about the inherent risks associated with a

Chapter 11 case and the recriminations which fly when rosy expectations of a successful

resolution of a multitude of serious interrelated financial issues are shattered and the

businessman who started the process is left astounded by how quickly he has learned that one's

attempt to control events can come to grief in a reorganization case without the support of

creditors.  Filing a Chapter 11 case is something like a very sick man taking very potent

medicine; it may restore him to health if it doesn't kill him.

The particular matters before the Court in this Chapter 11 case are two Final Applications

for Compensation for Debtor's general bankruptcy counsel, originally Copeland & Bieger, P.C.,

and then its successor with respect to representation of the Debtor in this case, Copeland Law

Firm, P.C.  In each of these firms Robert T. Copeland, Esq. has been the chief engagement

partner for the Debtor's representation.  To these Applications an Objection has been filed by

Richard D. Bays, the Debtor's former president and sole shareholder.  The Court has also

considered a Comment which has been filed by the Official Committee of Unsecured Creditors.

An evidentiary hearing was held in Abingdon on September 18, 2013, at which time the

Applications and the Objection were taken under advisement.  For the reasons set forth below,

the Court will partially approve the Final Applications for Compensation.

## FINDINGS OF FACT

*Filing of Case and Application to Employ*

This case was filed by the Debtor under Chapter 11 of the Bankruptcy Code on
November 21, 2011.  The petition was signed by its president, Richard D. Bays (Mr. Bays).  The
following day the Debtor filed an application, also signed by Mr. Bays, to employ Copeland &
Bieger, P.C. as general bankruptcy counsel to represent it as debtor-in-possession.   The
application stated,

> To the best of the Debtor's knowledge, the partners and associates of
> Copeland & Bieger, P.C. do not have any connection with or any
> interest adverse to the Debtor, its creditors or any other party in
> interest, or its respective attorneys and accountants, except as may be
> set forth in the declaration of Robert T. Copeland . . . .

(Application to Employ, at 3).  Attached to the application to employ was the Declaration of
Robert T. Copeland, Esq. which set out in relevant part:

> 6. Neither I, the Firm, nor its members to my knowledge represent or
> have any connection with any creditor or other party in interest in this
> case . . . except as disclosed below in paragraph 9. . . .

> 8. Prior to the commencement of Applicant's Chapter 11 case, the
> Firm was employed by and was rendering specialized legal counsel
> and advice to Applicant relating to the claims of default made by
> numerous creditors, especially Space Petroleum and Brad Penn
> Lubricants. . . .

> 9. The Firm has not in the past represented nor does the Firm in the
> future plan to represent any related Debtors or principals of the
> Debtor.  The Firm and Counsel's connections in this case are:  The
> principal of the Debtor is Richard Bays.  Mr. Bays is a resident of
> Washington County Virginia.  He is represented by John M. Lamie
> of Abingdon Virginia.  A conflicts check was performed on all of the
> creditors of the Debtor Miners Oil, Inc[.], as well as on all customers
> of Miners Oil to determine if there were any disputes with any
> customers who might owe the Debtor money.  As a result of the
> conflicts checks on both groups, it was determined that there were no

2

conflicts with any creditors, that is, there were no active files for any creditor, however two current clients are customers of the Debtor. These two customers are Noah Horn Well Drilling from Buchanan County and B & F Parts and Service of Tazewell County. As of the date of the conflicts check, there was no outstanding balance due by B & F to the Debtor. However, Noah Horn Well Drilling had a very active account, purchasing products from the Debtor and paying for all purchases from Thursday one week to Wednesday the next on Friday every week, so that as of the date of the petition, there would be an outstanding balance due to the Debtor. The Noah Horn matters are handled by Daniel Bieger of the Firm and he has inquired as to whether or not there were any disputes with the Debtor over the account and he has been informed that there are none known. Counsel has requested the firm of Penn Stuart to serve as Special Counsel in this case to handle conflicts matters should any such conflict arise or become known in the case.

10. . . . Prior to the commencement of this case, Applicant provided the Firm with a fee advance in the amount of Fifteen Thousand Dollars ($15,000) and a cost deposit of $1,046.00. The firm placed those funds in the Firms' [sic] trust account and on November 18, 2011 transferred Five Thousand Eight Hundred Sixty Two Dollars and Fifty Cents ($5,862.50) to the attorneys account for services rendered on February 4, 2011 and from October 20th to November 21, 2011. If requested a detailed statement of pre petition services will be provided.

(Declaration, at 1-3). A copy of the Advance Fee Agreement was also attached to the

application and, likewise, it was signed by Mr. Bays as president. The Advance Fee Agreement

contained the following limitation:

The Company acknowledges that it is a closely held corporation whose sole shareholder is Richard Bays, and that the Firm has explained that it cannot represent both the Company and Richard Bays in any matter related to or arising under any reorganization case which may be filed by the Company because he is an "insider" under the Bankruptcy Code. The Firm's representation of the Company excludes its representation of Richard Bays with respect to:

(1) his personal liability as a "control person" arising from any failure of the Company to pay federal or state withholding and other taxes;

(2) his filing of any proof of claim or interest in the Company's bankruptcy case;

(3) the defense of any claim which may be asserted by any Trustee or any creditors' committee against Richard Bays for the recovery of excess compensation, insider preferences, fraudulent transfers, setoffs, or for the equitable subordination of any claim or interest which he may assert;

(4) his assertion that any property in the possession of the Company is his personal property;

(5) any effort on his part either directly or indirectly to purchase any of the property of the Company from the Trustee (or from the Debtor in Possession if a sale not in the ordinary course of business is authorized by the Bankruptcy Court after notice and hearing);

(6) his assertion of any privilege against self-incrimination; and

(7) any other matters which in the exercise of the professional judgment of the Firm may create a conflict of interest in its representing the Company or the appearance of impropriety.

(Advance Fee Agreement, at 2-3). The Court sent a letter to Mr. Copeland expressing concerns regarding certain provisions of the Advance Fee Agreement unrelated to this decision on December 20, 2011. Mr. Copeland responded the next day stating that he would file an amended agreement. This Amended Engagement Agreement was filed on December 29, 2011 and was signed by Mr. Bays, as president, the same day. The agreement set forth, in relevant part:

8. Identity of Client. For the purposes set forth in this Agreement, and the Case contemplated herein, the Firm shall represent only the Client and no other party. All duties and responsibilities of the Firm created and imposed by this Agreement shall be owed only to the Client, and not to its board of directors or any officer, director, agent, or employee of the Client, or any other party to these proceedings. . . .

13. "Persons in Control" Excluded. The following categories of persons or entities as set forth in the Bankruptcy Code are excluded from representation under this Agreement: (a) representation of officers, directors or other "persons in control" in connection with any personal liability; (b) filing of proofs of claim or interest by such "persons in control" in the bankruptcy case; (c) defense of any claims asserted by a creditor, party in interest, creditors' committee or

trustee against such "person in control" for the recovery of excess compensation, insider preferences, fraudulent transfers, set-offs, or for the equitable subordination of claims; (d) assertion or right to assert that any property in the possession of the Client is the personal property of such "person in control"; (e) any effort on the part of such "person in control," either directly or through another person or entity, to purchase any of the property of the estate from the debtor, debtor-in-possession, or trustee if a sale not in the ordinary course of business is authorized by the Bankruptcy Court; (f) the assertion by any "person in control" of any privilege against self incrimination; and (g) any other matters which in the exercise of the Firm's professional judgment may create a conflict of interest, an appearance of impropriety, or a legal or moral position not otherwise approved by the rules of professional conduct or applicable federal or state law or rules.

(Engagement Agreement, at 3-5). The Court approved the application to employ with the amended engagement agreement by Order entered January 6, 2012.

### Interrelation of Miners Oil and Mr. Bays' Divorce Case

At the time of, and for several years prior to, the filing of this case, Mr. Bays had been involved in what appears to have been an exceedingly acrimonious divorce case with his estranged wife, Laura Bays (Ms. Bays). Not only did this litigation present difficulties to Mr. Bays individually, it also created problems for his wholly owned corporation, Miners Oil Company, Inc. (Miners Oil), which apparently was claimed to be "marital property" under applicable Virginia domestic relations law. The divorce case was a driving factor in the filing of not only the Miners Oil case but also a separate Chapter 11 petition filed by Mr. Bays individually.[1] Both bankruptcy cases were filed on the same day, which was the day before a

---

[1] Case No. 11-72355.

5

scheduled hearing in Virginia state court in the divorce case.[2]  Pursuant to an order entered in

that case on March 5, 2009, *nunc pro tunc* to December 13, 2006, Ms. Bays' gas charging

privileges were to be maintained at Miners Oil and any other store in which Mr. Bays held an

ownership interest.  Additionally, Ms. Bays had the right to advise Miners Oil if she needed

money for an unforeseen circumstance and Mr. Bays was to "ensure that she receives the

requested money."  These provisions were in addition to monthly support obligations payable by

Mr. Bays in the amount of $1,000 by direct deposit to her bank account, payment of up to $5,000

of charges on a credit card issued to her upon a Miners Oil account, and payment for her house,

vehicle, insurance, and other miscellaneous expenses.  Among the various recitals contained in

that March 5 order were references to various motions filed by Ms. Bays "for an injunction

prohibiting and restraining [Mr. Bays] from interfering in the operation of Miners Oil Company,

Inc., or any other of the marital business entities; . . . for an order prohibiting [Mr. Bays] from

directly or indirectly molesting, harassing, and imposing any physical restraint on her personal

liberty; . . . for an order requiring [Mr. Bays] to submit to a psychological examination by a

licensed psychiatrist chosen by the court; . . . for an order appointing a conservator to operate the

marital business entities; . . . [and] for an order finding [Mr. Bays] in contempt for his failure to

comply with a previous order of this court in that he had interfered with the operation of the

business he was specifically ordered not to interfere with."  (Order, at 1-2).

Following soon after the Court's approval of the application to employ Copeland &

Bieger, P.C., Mr. Copeland filed on January 23, 2012 an adversary proceeding against Ms. Bays

---

[2] *Laura D. Bays v. Richard D. Bays*, Case No. CL06-481-00, Circuit Court of
Washington County, Virginia.

seeking return of payments made to her or for her benefit by Miners Oil within the two year

period preceding the bankruptcy filing.[3]  Mr. Copeland testified at the hearing on September 19,

2013 that the adversary proceeding was filed with the goal of getting some of those payments

returned in order to fund ongoing operations and to stop her from using the corporate credit card.

This strikes the Court as an after-the-fact rationalization to explain the filing of this adversary

proceeding which in retrospect seems ill considered as an expenditure of scarce bankruptcy

estate resources.  Because all of the pre-petition payments appear to have been in the nature of

current living expenses, the thought of obtaining a quick refund from Ms. Bays of these amounts

seems fanciful.  Turning to the indicated intent to stop Ms. Bays from using a Miners Oil credit

card, the Court will make two observations:  first, the adversary proceeding Complaint makes no

reference at all to post-petition transactions or to Code § 549 which would be applicable to them;

and second, it would seem that a much quicker and more effective means of stopping her

continuing use of the credit card would have been simply to cancel the card she was utilizing and

give contemporaneous notice to Ms. Bays and her attorneys that such action was being taken.

The Court further notes that Mr. Copeland took no similar action at the time against the various

business entities owned or controlled by Mr. Bays individually which were not under bankruptcy

protection but owed substantial amounts to Miners Oil, which course of action seems open to

considerable question in light of the allegation contained in paragraph no. 7 of the Complaint

filed against Ms. Bays that Miners Oil had been "insolvent during the two (2) year period before

November 21, 2011."  Accordingly, the Court does not find the advanced justification for the

---

[3] The Complaint sought any payments made to or on behalf of Ms. Bays within the two
years prior to filing for which the Debtor did not receive reasonably equivalent value.  The
adversary proceeding was ultimately dismissed without prejudice.

filing of this adversary proceeding to be entirely convincing. The Court does find, based on a review of the billing records and proration of some of the block time entries there contained, that $3,237.59 in fees were charged to the Debtor for the services related to the drafting, filing, and prosecution of this adversary proceeding.

*Interrelation of Miners Oil, Mr. Bays, and Other Entities Owned by Mr. Bays*

In addition to his sole ownership of Miners Oil, Mr. Bays had various other business interests, most of which had some obligations to, or other business relationships with, the Debtor. Schedule B, filed in the Miners Oil case, disclosed a general line item for Accounts Receivable totaling $1,590,521 and specific line items for Accounts Receivable from Bays Investments, Inc.[4] (a corporation owned wholly by Mr. Bays) in the amount of $47,778, Progress Trucking Co., Inc. (a corporation owned 50% by Mr. Bays) in the amount of $449,777, and a shareholder receivable of $2,371,589 (representing money withdrawn from the company by Mr. Bays in a series of individual transactions).[5] Schedule F in Mr. Bays' individual bankruptcy case showed an undisputed debt owed to Miners Oil in the amount of $2,396,000. There was also overlap regarding Schedule E filed in each case with both listing priority claims owed to the Tennessee Department of Revenue (Miners Oil listed $117,329.85 and Mr. Bays

---

[4] There is a discrepancy in the filings in both this case and Mr. Bays' individual case as to whether the proper name is Bays Investment, Inc. or Bays Investments, Inc. The records of the Virginia State Corporation Commission list Bays Investments, Inc., so that is the name the Court will use throughout this opinion.

[5] Item no. 23 of the Miners Oil Statement of Financial Affairs indicated that in the twelve month period preceding the bankruptcy filing there had been distributions by the Debtor to, or for the benefit of, Mr. Bays and/or other withdrawals by him from it, totaling $453,135.72.

listed $148,472.42 and $22,173.60), U.S. Treasury (both Miners Oil and Mr. Bays listed

$36,515.90), Virginia Department of Taxation (Miners Oil listed $8,256.96 and $5,987 and Mr.

Bays listed $14,047.48), Virginia Employment Commission (both listed $413.47), and

Washington County Treasurer (Miners Oil listed $633.39 and Mr. Bays listed $1,703.75).  Mr.

Bays marked all of these claims as contingent and disputed.  On Schedule D, filed in the Miners

Oil case, Ally Financial ($38,049.84), BB&T ($5,138.55), Daimler Financial Services

($178,836.66), Ford Motor Credit ($48,846.87), New Peoples Bank ($2,781,935), Stearns Bank

($33,297.66), and Wells Fargo ($42,879.29) are all listed as secured creditors.  These creditors

also appear on Mr. Bays' personal Schedule F, in nearly the exact same amounts, as unsecured

creditors and are marked contingent and disputed.  On Amended Schedule F, filed in Mr. Bays'

individual case on February 17, 2012, he added Space Petroleum & Chemical Company in the

amount of $1,900,000 and marked the claim as contingent and disputed.[6]  This claim was

already included on Miners Oil's Schedule F in the amount of $1,709,991.49.  Schedule F filed

in the Miners Oil case listed a claim of $436,590.78 to American Refining Group, Inc.  While

the claim was not listed on Mr. Bays' schedules, American Refining Group filed a proof of

claim in his case in the amount of $350,000 based on a personal guaranty of Miners Oil's debt.

Both Space Petroleum and American Refining Group filed non-dischargeability complaints

against Mr. Bays with respect to their claims against him for credit extended to Miners Oil.[7]

---

[6] Space Petroleum filed a claim in Mr. Bays' individual case in the amount of
$1,921,363.67 alleging that the entire claim was non-contingent and liquidated due to an
unconditional personal guaranty of payment.  It also filed a claim in the Miners Oil case in the
same amount based on goods sold.

[7] *American Refining Group, Inc. v. Richard D. Bays*, A. P. No. 12-07016, and *Space
Petroleum & Chemical Company, Inc. v. Richard D. Bays*, A. P. No. 12-07018.

9

Schedule G filed in the Miners Oil case showed that Miners Oil was leasing land from Bays

Investments for $3,380 per month.  On Schedule H, on which debtors are directed to list all co-

debtors, Miners Oil only listed Mr. Bays as a co-debtor on the secured New Peoples Bank loan,

but Mr. Bays did not list Miners Oil as a co-debtor on any claim.

Mr. Bays was also a majority owner of five incorporated convenience stores which were

indebted to Miners Oil.  The schedules in Mr. Bays' individual case do not reveal anything

regarding the debt owed to Miners Oil by the convenience stores, which were each valued at $1,

but Schedule B in the corporate case lists "Accounts receivable" of $1,590,521, "Misc.

Receivables" of $12,822, "Fuel tax Receivables" of $26,080, and then the receivables already

listed for Bays Investments, Progress Trucking, and the shareholder receivable.  Although not

separately identified in Miners Oil's schedules, it appears that approximately $800,000 of its

general accounts receivable, that is to say more than 50%, represented fuel or other credit that it

had furnished to these convenience stores.  Mr. Bays shared ownership of the corporations

owning these stores with an investment partner, Robert Breimann, who had also served as his

long time personal and corporate attorney.[8]  Unfortunately these stores were in severe financial

distress as well and proved to have no actual present ability to repay the credit which Miners

Oil had extended to them.

---

[8] The debt owed by the convenience stores to Miners Oil is itemized as follows:  Kents
Ridge Grocery, Inc., $71,984.84; Green Springs Grocery, Inc., $433,176.22; Lakeway Speed
Mart, Inc., $33,184.71; Doran Grocery, Inc., $109,254.93; and Midway Grocery, Inc.,
$149,143.36, for a total of $796,744.06.  These figures have been obtained from the exhibits
filed in support of the Chapter 11 Trustee's Motion to Sell on April 5, 2013 in Mr. Bays'
individual case.  These exhibits were admitted into evidence on April 10, 2013.

*Mr. Bays' Removal from Management of Miners Oil*

On January 23, 2012, the same date that he filed the adversary proceeding against Laura Bays, Mr. Copeland also filed on behalf of the Debtor an application to employ Kenneth Hess, a retired former employee, as its general manager and in that application stated "the owner of the Debtor will reduce his compensation and role in management of the Debtor, in favor of Mr. Hess." (Application, at 2). On that same date, the Official Committee of Unsecured Creditors[9] filed a motion to appoint a Chapter 11 Trustee and the United States Trustee also filed a motion to appoint a Trustee and objected to the Debtor's payment of any compensation to Mr. Bays. The Committee filed a response to the Debtor's application to employ Mr. Hess on February 3, 2012 stating,

> The Committee believes that it is in the best interest of the estate and the creditors that Bays have no role in management of the Debtor's business so that Hess will be able to make business decisions without the influence of Bays. Moreover, it does not appear that Bays should receive any compensation from the Debtor given his minimal role going forward and, as set forth in the Trustee Motion, his historic lack of involvement in the day to day operations of the business.

(Committee's Response, at 2). Mr. Copeland, on behalf of the Debtor, filed a response to the Committee's and the United States Trustee's motions to appoint a trustee on February 6, 2012 and defended Mr. Bays' actions under the business judgment rule and argued that a significant cause for the filing of this case was the constant draining of funds required by the divorce case. On February 8, 2012 Space Petroleum & Chemical Company joined the Committee's and the United States Trustee's motions to appoint a trustee. Twenty days later the Committee and the

---

[9] The Committee is comprised of Space Petroleum & Chemical Company, Inc.; Warren Oil Company; KOST USA; Summit Lubricants, Inc.; and Gas Station Supply.

11

Debtor filed a joint motion seeking approval of an agreement resolving the Committee's motion

to appoint a Trustee.  The agreement set out a number of terms, including a commitment by Mr.

Bays to resign immediately as president of the Debtor and as a voting member of its board of

directors and turn over management to a Chief Restructuring Officer.  Contemporaneously with

the filing of this motion, Mr. Copeland filed an application to employ P. Michael Kain as Chief

Restructuring Officer.  Both the agreement and the application were approved after notice and a

hearing and orders to such effect were entered on March 15, 2012.


*Subsequent Proceedings in Corporate and Individual Cases*

Almost on the heels of this separation of Mr. Bays from any role in the management of

Miners Oil came a development involving the company's insurance coverage which in effect

converted Mr. Kain's job from Chief Restructuring Officer into Chief Crisis Management

Officer.  The chain of events which that development began destroyed any realistic possibility

that the Debtor might be able to reorganize and "earn" its way back to amicable business

relationships with its creditors.

The Debtor's principal business was the sale and delivery of bulk vehicle fuels and

lubricants.  This involved the bulk storage of petroleum products and their transport to its own

facilities and the business locations of its customers.  The continuation of this business was

absolutely dependent upon its ability to maintain legally required liability insurance in force.

Furthermore the Debtor was contractually obliged to its secured creditors to maintain casualty

insurance in effect upon its property, which also was a requirement for the Debtor's continued

operation of its business as a Chapter 11 debtor.  Apparently as a result of the bankruptcy filing,

12

the Debtor's existing insurer was unwilling to renew its existing coverages which were due to

expire on July 7, 2012.  Unless new insurance coverage could be obtained, it was obvious that

the Debtor's actual viability was at stake and the company would be faced with cessation of its

operations, loss of its business, and presumably an early conversion to a Chapter 7 liquidation.

On June 26, 2012 the Debtor filed an Emergency Motion for Permission to Incur Post-Petition

Debt seeking approval to finance $169,650 for insurance premiums through two loans with

Carter Machinery Co., Inc. and Imperial Credit Corporation.  The terms of the loans required

that the money be paid back in twelve equal monthly installments and that the loans be given

administrative priority status under 11 U.S.C. § 364(b).  The Motion was conditionally

approved by Order entered June 27, 2012, which set a deadline of July 5 to file an objection

thereto.  The United States Trustee filed an Objection to Motion to Incur Debt on July 5, 2012

on the basis that the terms of the financing differed from those set forth in the motion.  An

Order was entered following the hearing on July 6, 2012 that approved the Debtor's authority to

enter into a premium finance agreement with IPFS Corporation and granted a first priority

security interest in the insurance policies.  A second Order was entered the same day granting

the Emergency Motion on a final basis.  Although replacement coverage was finally placed in

the nick of time, the cost of that coverage was so much higher than had been the case previously

that the company would be unable to sustain that expense for very long based on the level of its

operations in bankruptcy.  Accordingly, the Debtor was forced to pursue a sale of either its

operating assets or itself forthwith because its clock was most definitely ticking.

The Debtor filed a Motion for Entry of a Sale Procedures Order on July 27, 2012 to

establish bidding procedures to sell the Debtor's assets based on a letter of intent received from

13

Sampson Bladen Oil Company, Inc.  Mr. Bays objected to the motion on the grounds that the

Sampson Bladen offer was conditioned on receipt of a non-compete covenant signed by Mr.

Bays and on a five year lease of the adjacent real estate used by Miners Oil but owned by Bays

Investments, Inc.  At the time of the objection Mr. Bays had not agreed to either condition and

thus argued that the motion was premature.  He asserted that Miners Oil had been working

towards an auction without seriously considering the possibility of reorganizing.  In referencing

a plan he filed in this case on July 6, 2012,[10] he stated that he was unable to respond to the

Committee's concerns regarding feasibility due to the lack of financial information available to

him.  Through his objection Mr. Bays sought denial of the Sale Procedures motion and an order

requiring the Debtor to produce additional information concerning the sale.  Ultimately

amended bidding procedures were approved on August 28, 2012, over Mr. Bays' objection, and

an auction sale was held and concluded on September 12, 2012 at which Jones Oil Company,

Inc. was the successful bidder.  On October 2, 2012 the United States Trustee filed a Motion to

Convert the case to Chapter 7 as it did not look like the sale to Jones Oil would close due to Mr.

Bays' refusal to lease or convey the real estate adjoining the Miners Oil property.  The Debtor

responded to the Motion to Convert by stating that the sale was scheduled to close on October

5, 2012 but was delayed due to Mr. Bays' refusal to consent to lease or sell the adjoining

parcels.  The Debtor had filed a plan and disclosure statement crafted by Mr. Copeland in Mr.

Bays' individual case in an effort to liquidate his assets and consummate the sale to Jones Oil.

The plan, filed by Miners Oil on August 14, 2012 and amended on September 5, called for a

---

[10]  The plan proposed to pay creditors over a period ranging from one to eighty-four
months with a payment of $69,949.33 in the first month and $68,902.47 each month thereafter
for the remaining months of the plan.  Docket entry no. 241.

14

timely liquidation of Mr. Bays' assets.  Confirmation of that plan came on for hearing on

October 17, 2012[11] at which time an agreement was reached with Mr. Bays whereby he would

authorize the sale of the adjoining parcels of land.  At that same hearing the Court ordered that

the Miners Oil case would be converted on the United States Trustee's motion unless the sale

closed on or before November 5.  A certification of closing was filed on October 30, 2012

indicating that the sale took place on October 23, 2012.

*Applications for Compensation*

Copeland & Bieger filed a series of five applications for compensation between January

26, 2012 and January 3, 2013, all of which were approved by the Court subject to a 15% hold-

back on payment of otherwise approved compensation pursuant to the agreement between Mr.

Copeland and the United States Trustee.  The total amount sought in those five applications was

$109,285.05 in fees and $2,439.89 in expenses for a total of $111,724.94, of which $94,460.01

was approved on an interim basis and $17,264.93 was held back pending the Court's approval

of the firm's Final Application.  The law firm of Copeland & Bieger was dissolved on

December 31, 2012 and Mr. Copeland continued representation of the Debtor after that date

with his new firm, Copeland Law Firm, P.C.  A Chapter 11 Plan was confirmed on March 29,

2013.  On April 23, 2013 Mr. Copeland filed Final Applications for Compensation on behalf of

Copeland & Bieger, requesting final approval of fees and expenses that were already awarded

on an interim basis and the amounts not yet awarded pursuant to the hold-back for a total of

---

[11] The plan that Miners Oil filed in Mr. Bays' case was never confirmed as a Chapter 11
Trustee was appointed.

$111,724.94, and on behalf of Copeland Law Firm requesting approval of $14,125.00 in fees

and $1,626.34 in expenses for a total of $15,751.34 subsequent to the dissolution of Copeland &

Bieger and ending on the date of confirmation.  In a pleading styled "Supplemental Fee

Information" filed on May 31, 2013 (see footnote no. 12), the amount sought for fees in the

latter application was increased from $14,125 to $17,050 with detailed entries provided.

On May 16, 2013 Mr. Bays, by counsel, filed an Objection to both Applications alleging

a pre-petition conflict of interest and inadequate disclosure of such conflict to the Court.  In the

Objection Mr. Bays asserts that he believed Mr. Copeland was representing him in his personal

capacity during pre-petition meetings on February 4, 2011 and from October 20, 2011 to the

petition date.  Mr. Copeland developed a "comprehensive legal strategy," he states, where he

and Miners Oil would each file for bankruptcy.  Mr. Bays goes on to argue that he formed a

personal attorney-client relationship with Mr. Copeland during this pre-petition planning

period.  Additionally, he contends that Mr. Copeland failed to make the requisite disclosures

regarding the conflicts to the Court in his application to employ:

> Mr. Copeland knew that at the time of filing the Miners Oil
> Company, Inc.'s bankruptcy petition that Miners Oil Company, Inc.
> was owed nearly $2.4 million from Richard Bays, that Miners Oil
> Company would likely be the largest creditor in Mr. Bays' personal
> bankruptcy, and that he would have to take legal positions adverse
> to Mr. Bays' stated legal goals to retain ownership of Miners Oil
> Company, Inc. and to negotiate settlements with his wife, Laura
> Bays, and his former attorney and business partner, Robert
> Breimann.

(Objection, at 6).  Through his Objection, Mr. Bays requests that the orders approving the

employment of Mr. Copeland, Copeland & Bieger, and Copeland Law Firm be vacated and that

Mr. Copeland and Copeland & Bieger disgorge any and all fees and expenses previously

16

approved.

Counsel for the Official Committee of Unsecured Creditors filed a Comment to the Final

Application of Copeland Law Firm on May 17, 2013 requesting clarification regarding

descriptions of certain time entries and some missing time entries.  A hearing was held on May

22, 2013 at which Mr. Copeland's request to file a supplement to his Application for

compensation was granted.[12]  Daniel R. Bieger, Esq. appeared on behalf of Copeland & Bieger

and Copeland Law Firm and asked for the opportunity to file a response to Mr. Bays' Objection

and to brief the issues of standing and estoppel; this request was also granted.  On May 30, 2013

Mr. Bieger filed a response asserting that Mr. Bays does not have standing to file the Objection

and it should be dismissed due to waiver or equitable estoppel.  Mr. Bieger also filed a

memorandum in support of his response.  In summary, he argued that Mr. Bays does not have

standing to object because a Chapter 11 Trustee has been appointed in his individual case and

the Chapter 11 Trustee has not objected to either Application.  Additionally he contended that,

because Mr. Bays signed the application to employ and employment agreements on behalf of

the corporation acknowledging that there could not be dual representation, he could not assert,

so long afterwards, that there was dual representation based on the doctrines of waiver and

estoppel.  Mr. Bays filed a reply to the response on June 4, 2013 which largely reiterated the

concerns raised in his Objection.  He also discussed the unresolved issue of a February 4, 2011

initial conference, as the application to employ listed it but then Mr. Copeland stated he had no

recollection of the meeting in his affidavit filed in opposition to the Motion for a Rule 2004

---

[12] Copeland Law Firm's supplemental fee breakdown, filed May 31, 2013, revised the
previous Application and requested total compensation in the increased amount of $17,050 for
fees plus expenses of $1,626.34 for a total of $18,676.34.  Docket entry no. 444.

examination.[13]  Mr. Bays claimed that during the pre-petition meetings he divulged personal and confidential information to Mr. Copeland based on the belief that Mr. Copeland could resolve both his personal and business issues through bankruptcy.

A hearing was held on June 5, 2013 at which the Court overruled the contentions raised by Mr. Bieger of lack of standing, waiver, and estoppel and determined that the Objection would go forward as it raised questions that implicated the integrity of the process by which the original application to approve the employment of the law firm was determined.  At that hearing counsel for the Official Committee of Unsecured Creditors confirmed that Mr. Copeland's amendment to the Application for Compensation of Copeland Law Firm satisfied the Committee's concerns.  On June 6, 2013 the Court entered an Order setting forth its ruling from the hearing and limiting the scope of the proposed discovery to the time period beginning with the first professional contact between Mr. Copeland and Mr. Bays and ending with the date of the appointment of a Chief Restructuring Officer.  It also limited the scope of the subject matter to any personal confidential information revealed prior to filing and any use of such information to the disadvantage of Mr. Bays, an itemization of pre-petition legal services whether or not charged for, all internal records relating to legal services provided to the Debtor and/or Mr. Bays pre-petition, and any other information supporting or relating to the allegations that Mr. Copeland was serving as Mr. Bays' personal legal counsel or in any other manner made materially inaccurate or incomplete representations to the Court in the application to employ. Additionally, the Order directed the parties to confer and submit a discovery schedule, which

---

[13] The Motion for Rule 2004 examination was filed in Mr. Bays' individual case and was denied by Order entered June 13, 2013.

was set forth in an agreed order entered on June 19, 2013; the order also set an evidentiary hearing for September 18, 2013.

Pursuant to that agreed Order, which was modified subsequently upon motions filed by counsel for the parties, on September 16, 2013 Mr. Bieger filed an amended witness list and the next day filed a list of seven enumerated exhibits consisting of the application to employ, original bankruptcy worksheets completed by Mr. Bays as president of Miners Oil, the amended engagement agreement, the Chapter 11 petition, five interim applications for compensation, the pre-petition billing statement from Copeland & Bieger, and e-mails from Mark Esposito, yet another attorney involved in the pre-filing discussions and planning, and Thomas M. Hicok, Mr. Bays' accountant.  Mr. Anderson also filed an exhibit list on September 17, 2013 detailing Exhibits A – M, which included the application to employ, amended fee agreement, a number of intra-office e-mails between Mr. Copeland and his assistant, Theresa Blankenship, or between Mr. Copeland and Mr. Bieger, the e-mails included in Mr. Bieger's exhibits, the pre-petition billing statement, and "Robert Copeland Loose Papers."[14]

*Testimony Given at the Hearing*

Mr. Copeland appeared and testified at the hearing on September 18, 2013, and largely reiterated the assertions made in his response filed to the Objection.  He also discussed the circumstances surrounding the February 4, 2011 meeting.  Mr. Copeland previously filed a

---

[14] This exhibit consisted of a copy of a page from Mr. Copeland's intact legal pad, and it had notes he took during a meeting regarding this case. Although this page is undated, it appears to be most likely a product of a meeting which took place on October 18, 2011 involving Mr. Copeland, Mr. Bays and Mr. Hicok.

response to Mr. Bays' Motion for Rule 2004 Examination and he attached an affidavit to the

effect that he had not charged for the meeting on February 4.[15]  Exhibit L, the pre-petition

billing statement Mr. Copeland created and produced in discovery, did not show a meeting or a

charge for February 4.  The first entry is dated October 20, 2011.  Upon questioning Mr.

Copeland admitted that he later found a different version of the pre-petition billing statement,

Exhibit 6, which showed a two-hour meeting on February 4 and that he charged Miners Oil for

the time.  While he knew that his previous production was inaccurate, as well as his affidavit, he

did not take steps to remedy either beyond filing the amended pre-petition billing statement as

an exhibit.  Exhibit N was a note Mr. Copeland made on a legal pad that was dated "2/14/11"[16]

with the heading "Miners Oil."  Interestingly, this sheet does not even contain the name of Mr.

Bays, although it does contain the name of Gary Charles, an employee of Miners Oil.  Mr.

Copeland also testified about a meeting which occurred on October 18, 2011 where he met with

Mr. Bays and Mr. Hicok.[17]  At this meeting Mr. Copeland called Mr. Lamie and either spoke

with him or left a voice message in order to refer Mr. Bays' personal bankruptcy case to Mr.

Lamie.

John M. Lamie, Esq. then testified regarding the commencement of his representation

of Mr. Bays individually, which he stated began on November 10, 2011.[18]  This date was more

---

[15] The motion and response were filed in Mr. Bays' individual case.

[16] The discrepancy between the date of the indicated initial meeting on February 4, 2011 and the indicated date of February 14, 2011 on this exhibit was not explored or explained at the hearing.

[17] This meeting does not appear on either pre-petition billing statement.

[18] The bankruptcy petitions were filed on November 21, 2011.

than three weeks after the date of the October 18 meeting during which Mr. Copeland is indicated to have told Mr. Bays that he would need to be separately represented.  When Mr. Anderson asked Mr. Lamie whether Mr. Bays had communicated any discontent with Mr. Copeland's representation, he replied affirmatively, beginning in the Fall of 2012 when Mr. Copeland filed a plan in Mr. Bays' case to liquidate his assets.  Mr. Anderson also questioned him with regard to whether Mr. Bays wanted Mr. Lamie to assert claims against Mr. Copeland. Mr. Lamie answered that Mr. Bays had asked that he do so, but he declined as he did not see any damages and he was a personal friend of Mr. Copeland and would not have represented Mr. Bays in such an action.  Mr. Lamie also testified, in response to questions by Mr. Bieger, that Mr. Bays came to him to represent him personally as he already had counsel for the corporation. He further stated that the timing of the filing for bankruptcy was at the direction of Mr. Bays, in consultation with his divorce attorney, due to a pending hearing in Mr. Bays' divorce case set for November 22, 2011.  Both Miners Oil's petition and Mr. Bays' petition were filed on November 21, 2011, with Miners Oil's case being filed first and assigned a case number of 11-72354 and Mr. Bays' case being filed next with a case number of 11-72355.  Mr. Lamie stated that there was no effort to coordinate the filings with Mr. Copeland except for the looming divorce court hearing.

Mr. Bays testified next concerning the bases for his Objection and his relationship with Mr. Copeland.  He discussed going to see Mr. Copeland to resolve his corporate and personal issues regarding his divorce and his conflicts with his business partner.  He stated that he told Mr. Copeland about the approximately $800,000 in debt owed from the convenience stores to Miners Oil and his personal obligations to the company.  Mr. Bays testified that he thought of

Mr. Copeland as the "quarterback" who would align things both personally and on a corporate level for him. Because of this, he stated that he told him everything concerning his divorce and the debts owed among his various entities. Mr. Bays contended that Mr. Copeland made the decision that he would represent Miners Oil, not Mr. Bays, and then referred his personal bankruptcy to Mr. Lamie. He continued that Mr. Copeland never informed him that he would have to take an adverse position to him personally, and if he had done so, Mr. Bays would have "found the door" and left. Upon questioning by Mr. Bieger, he later admitted that there was no confidential information revealed to Mr. Copeland as all of the information provided would have been disclosed in the bankruptcy petition. On redirect, Mr. Bays testified regarding his agreement to be removed as president of Miners Oil and to his replacement by a Chief Restructuring Officer.

Subsequent to Mr. Bays' testimony, Mr. Bieger moved to dismiss the Objection on the ground that no confidential information had been revealed. The motion was denied due to outstanding issues of disclosure to the Court. After the motion was denied, Mr. Bieger called Mr. Thomas Hicok, a certified public accountant who worked with Mr. Bays. Mr. Hicok testified that he participated in a meeting with Mr. Bays and Mr. Copeland on October 18, 2011 where Mr. Copeland explained that he could not represent both Mr. Bays personally and Miners Oil. He also stated that Mr. Copeland contacted Mr. Lamie while they were in that meeting to discuss Mr. Lamie's representation of Mr. Bays in his personal bankruptcy. Mr. Ken Hess, general manager of Miners Oil, was called next. Mr. Hess testified that he had discussions with Mr. Bays concerning the roles of attorneys in the case and that he told Mr. Bays that Mr. Copeland represented Miners Oil and not him personally. Mr. Gary Charles, who worked in

22

operations for Miners Oil and was called next, spoke of similar situations where Mr. Copeland

explained to Mr. Bays his role in representing Miners Oil.  He added that when Mr. Bays asked

Mr. Copeland questions regarding his personal affairs, Mr. Copeland told him that he would

need to speak to Mr. Lamie about those issues.  Finally, Mr. Travis Proffitt, the bookkeeper and

accountant for Miners Oil, was called.  He also affirmed that all meetings held which he

attended were relative to Miners Oil and no personal legal advice was given to Mr. Bays.

Following closing arguments the Court took the Final Applications and Objection under

advisement.  Before doing do, however, the Court invited the United States Trustee's trial

attorney, who had been present during the hearing, to comment on the questions presented to

the Court.  He advised that after listening to the testimony which had been given, the United

States Trustee did not choose to join in the Objection asserted by Mr. Bays.


CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on

July 24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western

District of Virginia.  An application for employment is a "core" bankruptcy proceeding

pursuant to the particular authority of 28 U.S.C. § 157(b)(2)(A) for "matters concerning the

administration of the estate" and consideration of an application for compensation to be paid

from the bankruptcy estate is likewise a "core" proceeding pursuant to § 157(b)(2)(B) as it

involves "allowance or disallowance of claims against the estate."

The circumstances presented in this case are quite unusual.  The issue raised in the

Objection to the Copeland Law Firm's Final Application was not raised at the time the Debtor

filed its application to employ the firm to represent it as lead counsel to it as debtor-in-

possession in this case or as an objection to any of the five interim fee applications which the

firm filed thereafter.  The Objection was not filed by any creditor of the Debtor, the United

States Trustee, the Unsecured Creditors' Committee, which has been quite active in the case, or

the Debtor itself.  Indeed the party raising the Objection, Mr. Bays, is a major obligor to the

Debtor as well as being the Debtor's owner, former CEO, and signatory on behalf of the Debtor

to the latter's application to employ the firm as its bankruptcy counsel.  The impetus behind the

filing of the Objection is not based on any contention that the firm failed to render competent

and aggressive legal advice to the Debtor as debtor-in-possession, but that it did so in such a

zealous manner that the interests and wishes of Mr. Bays were disregarded and that Mr.

Copeland became adverse to him.  While the nature of the Objection suggests "sour grapes" on

the part of Mr. Bays and a desire to retaliate against Mr. Copeland, this Court nevertheless

concluded that it was appropriate to conduct a full evidentiary hearing on the issues raised

because they implicate the integrity of the information provided to the United States Trustee

and the Court upon which the latter's original approval of the application to employ the firm

was based.

### *Obligation of Counsel to Disclose "Connections" with Parties in Interest*

During the past decade this Court has had several opportunities to review and enforce

the obligation of counsel for a Chapter 11 debtor seeking to be employed as general bankruptcy

counsel for the client as debtor-in-possession, that is to say in its effective capacity as

24

bankruptcy trustee, to disclose "all connections" which the attorney has with the debtor,

creditors and other parties in interest.  The Court will summarize these decisions in

chronological order.

In the case of *In re Five Forty Park Corp.*, No. 03-04746 (Bankr. W.D. Va. Sept. 30,

2004), this Court prospectively disqualified counsel due to its failure to disclose the firm's pre-

filing representation of one side of a bitter inter-family dispute involving the corporate debtor.

This Court reviewed in some detail the disclosure responsibilities imposed upon counsel by

Bankruptcy Rule 2014, which

> obliges the trustee or debtor-in-possession to include in an
> application for employment of a professional person, "to the best of
> the applicant's knowledge, all of the person's connections with the
> debtor, creditors, [and] any other party in interest", and similarly
> requires the professional person to make "a verified statement . . .
> setting forth the person's connections with the debtor, creditors,
> [and] any other party in interest".  This disclosure must be explicit
> enough for the court and other parties to gauge whether the person
> is not disinterested or holds an adverse interest.  In re Midway
> Industrial Contractors, Inc., 272 B.R. 651, 662 (Bankr. N. D. Ill.
> 2001)[.] Published bankruptcy court decisions are quite consistent
> in requiring that debtors-in-possession and their attorneys, whose
> employment is sought to be approved, be meticulous in disclosing
> "all connections" with the debtor and other parties in interest, the
> failure to do so justifying a court's taking significant punitive or
> corrective action.  If no actual conflict of interest is presented and
> the Court is satisfied that there was no intent to conceal on counsel's
> part, disqualification of counsel and/or denial of all compensation is
> not mandated and the proper remedy is left to the Court's broad
> discretion.  See In re Northwestern Corp., No. 03-12872 (CGC), 43
> Bankr. Ct. Dec. 93, 2004 Bankr. LEXIS 1023 (Bankr. D. Del. July
> 23, 2004) (disqualification denied because disclosures made early in
> case to United States Trustee indicated no intent to conceal); and In
> re Midway Indus. Contractors, Inc., 272 B.R. 651, 663-65 (Bankr.
> N.D. Ill. 2001).  Nevertheless, because "[t]he objective of requiring
> disclosure is not so much to protect against prejudice to the estate,
> but to ensure undivided loyalty and untainted advice from
> professionals[,] [citation omitted] . . . lack of disclosure in and of

25

> itself is sufficient to warrant disqualification, even if in the end there
> was no prejudice." Id., 272 B.R. at 664. See also In re Rabex
> Amuru of North Carolina, Inc., 198 B.R. 892 (M.D.N.C. 1996)
> (attorneys for debtor removed because of appearance of impropriety,
> even though no harm done to debtor).

*Five Forty Park*, slip op. at 22-23. After identifying five specific omissions of disclosure which the Court believed to be material, it concluded that "[t]he magnitude and seriousness of these failures to disclose were such as to provide the Court and the United States Trustee with a materially incomplete and misleading understanding of the nature of [the firm's] pre-petition involvement with the Debtor and its equity and creditor constituencies." *Id.* at 18.

The case of *In re Byington*, 454 B.R. 648 (Bankr. W.D. Va. 2011), involved an unusual factual situation where the Debtors' son, who had been the recipient of a transfer by the Debtors of their ownership stakes in three closely held corporations, provided to their bankruptcy counsel a check for the required $1,039 filing fee. This Court summarized the pertinent facts and its conclusions as follows:

> The transfer of the companies to the son was disclosed, as it had to
> be, in [the Statement of Financial Affairs], but the combined facts of
> the transfer to the son, his participation in the conference at which
> the decision, whether provisional or final, was reached for the
> parents to file a Chapter 11 case, and his providing the case filing
> fee for that decision to be implemented were not mentioned in the
> Application or the Firm's accompanying Declaration. The Court
> concludes that such facts should have been disclosed as they may
> bear on the extent, if any, to which the son is involved as a
> controlling force in the parents' bankruptcy and indeed their very
> decision to file bankruptcy and the timing for doing so, as well as
> whether as a result of the son's involvement the Firm would feel
> itself constrained from examining with a completely unclouded eye
> the propriety of that transfer to him.

*Id.* at 658. Although in view of the singular facts of the case the Court did not disqualify counsel for his failure to disclose these "connections" with a party in interest, it voiced, with

26

specific reference to the information required in the Statement of Financial Affairs, the general

principle that "[a]ny close or debatable issue ought to be resolved in favor of disclosure."  *Id.* at

650.  The Court concludes that this general principle is equally applicable to the disclosure of

the "connections" required by Rule 2014.

In the case of *Circle T Pipeline, Inc.*, No. 11-70556, 2011 Bankr. LEXIS 2490 (Bankr.

W.D. Va. April 27, 2011), the United States Trustee took issue with the corporate Debtor's

counsel's pre-petition representation of one Larry Sturgill, who was the corporation's

accountant and a co-obligor of a portion of its secured debt.  Mr. Sturgill considered the

attorney in question, Mr. Copeland in fact, to be the best Chapter 11 bankruptcy reorganization

attorney around and recommended to the corporation that Mr. Copeland be engaged to file a

Chapter 11 petition for it.  Knowing that Mr. Copeland could not continue to represent him and

also represent the corporation, Mr. Sturgill on his own initiative retained another attorney to

represent his interests in the case.  This Court summarized the situation presented and its

conclusions in considering the assertion by the United States Trustee that counsel's disclosure

of his "connection" to Mr. Sturgill had been inadequate to disclose all relevant facts, as follows:

> The Court notes, however, that we are not dealing with whether the
> disclosures made would have been sufficient for Mr. Sturgill to
> disclose all of his connections with the Debtor if he sought to be
> employed as its accountant in this case, which definitely would not
> have been the case, but whether Mr. Copeland, who properly
> disclosed his "connection" with Mr. Sturgill, should have made an
> inquiry sufficient to disclose to the Court all of the information
> needed for it to assess properly the likely extent that Mr. Sturgill's
> economic interests would be in play in the bankruptcy case.  The
> Court acknowledges that such would have been the better practice
> and much more in line with the obligations of counsel to disclose
> "[a]ll facts that may have any bearing on the disinterestedness of a
> professional" and "to make sure that all relevant connections have
> been brought to light."  *In re Leslie Fay Cos.*, 175 B.R. 525, 536

(Bankr. S.D.N.Y. 1994). Even so, it is only fair to observe that the extent of the information provided about Mr. Sturgill may well have been shaped by the questions raised by counsel for the United States Trustee when Mr. Copeland sought to raise this issue of his representation of Mr. Sturgill prior to his agreeing to undertake representation of the Debtor. Even if this additional information had been provided to the Court regarding the nature of Mr. Sturgill's involvement with the Debtor, it does not see that it changes the Court's assessment that under the circumstances presented here it ought not to disregard the Debtor's clearly expressed desire to continue to be represented by Mr. Copeland. In summary, this additional information regarding Mr. Sturgill's economic and professional involvement with the Debtor does not cause the Court to question counsel's ability to provide untainted devotion to the interests of his client in this case or to suspect that counsel has intentionally abbreviated his disclosures to the Court and the United States Trustee. If the Court concluded that either was the case, its analysis would be much different.

*Id.* at * 53-55.

Most recently, in the case of *In re Vencill*, No. 10-72956 (Bankr. W.D. Va. October 31, 2011), this Court took exception to the failure of counsel for an individual debtor to disclose the fact that he had given pre-filing advice to the client concerning a transfer of family property to her son which she made after engaging the attorney to file a Chapter 11 case. This Court concluded that this involvement should have been disclosed in the following words:

The Court concludes that Debtor's [counsel's] pre-petition advice to his client concerning a transfer of property which she wished to effect to a close family member for personal rather than business reasons was a "connection" which he was obliged to disclose explicitly in his Declaration accompanying the application to approve the Firm's employment. The disclosure which was made, that the Firm had provided "specialized" advice to the client was vague to say the least and woefully inadequate to apprize the Court of a matter which could compromise counsel's vigorous representation of the interests of the bankruptcy estate. The fact that he had given advice to her on such a matter, irrespective of what the advice was, obviously was a factor which reasonably would influence his professional advice to the client as post-filing debtor-

28

in-possession about whether that transaction was suspect.

*Vencill*, slip op. at 21-22.  Counsel's failure to disclose that "connection" coupled with his post-petition efforts to obscure its existence from the Court and other parties in interest resulted in the vacating of the order approving the application to employ such counsel and such counsel's disqualification.

Other bankruptcy courts have also noted the duty of counsel wishing to be employed as general bankruptcy counsel for a Chapter 11 debtor-in-possession to disclose sufficient detail concerning pre-filing connections with parties in interest that the Court and the United States Trustee are fully informed as to the relevant circumstances surrounding such connections.  This principle was upheld and applied by Judge Kevin Huennekens of the Bankruptcy Court for the Eastern District of Virginia in the case of *In re Lewis Road, LLC*, No. 09–37672, 2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011).  There the Debtor in its application to employ stated that proposed counsel had "connections with a creditor" and that the "potential conflict of interest has been waived" but without providing any other detail.  *Id.* at *1-2.  Proposed counsel did not file its own certification pursuant to Rule 2014.  Citing to and quoting from this Court's *Circle T Pipeline* decision, Judge Huennekens held that this disclosure was insufficient to satisfy the requirement of Rule 2014 due to its lack of detail.  *Id*. at *12.  The facts of that case were considerably more egregious than those present here as the firm had more than just a "connection" to a creditor, it concurrently represented the creditor and the debtor-in-possession in the bankruptcy case, but the principle does not vary whether the facts are egregious or only problematic.  Even more recently Judge Thomas Small of the Eastern District of North Carolina Bankruptcy Court denied all compensation to a firm representing a Chapter 11 debtor-in-

29

possession due to its failure to disclose that it also represented the 50% owner of a limited

partnership to which the Chapter 11 debtor client had transferred property of significant value

shortly before her petition filing.  Judge Small noted:

> [E]ven if the firm was unsure about whether the joint representation
> was permissible, at a minimum [it] certainly had an obligation to
> disclose the potential conflict and to bring the issue to the court's
> attention. [Its] failure to make that required disclosure meant that the
> court reviewed the employment application on incomplete
> information and the misleading statement that the firm did not have
> a conflict and was disinterested.

*In re Mitchell*, 497 B.R. 788, 793 (Bankr. E.D. N.C. 2013).  *See also In re LPN Healthcare*

*Facility Inc.*, 498 B.R. 196, 200 (Bankr. S.D. Ohio 2013) (order approving employment of

accounting firm vacated due to such firm's failure to disclose as a "connection" the fact that it

also was providing accounting services to individuals and entities involved with the debtor-in-

possession).


*Ethical Responsibilities of Counsel*

This Court also has had occasion to address the intersection of an attorney's

responsibilities as an officer of the court with the ethical obligations the attorney has under

applicable state bar Rules of Professional Responsibility.  In the same *Circle T Pipeline*

decision already noted, the following discussion appears:

> Lastly, the authority of bankruptcy courts to require adherence to the
> applicable ethical obligations of the attorneys practicing before them
> is well established.  As this Court noted in a joint decision signed by
> all three of its judges:

>> Bankruptcy courts are statutorily designated as "a unit" of
>> the federal district courts and bankruptcy judges are declared to be
>> "judicial officer[s]" of the district court by 28 U.S.C. § 151, which

30

provides as follows:

> In each judicial district, the bankruptcy judges in
> regular active service shall constitute a unit of the
> district court to be known as the bankruptcy court for
> that district.  Each bankruptcy judge, as a judicial
> officer of the district court, may exercise the
> authority conferred under this chapter with respect to
> any action, suit, or proceeding and may preside alone
> and hold a regular or special session of the court,
> except as otherwise provided by law or by rule or
> order of the district court.

> It is part of the inherent authority of bankruptcy judges as judicial
> officers of the United States District Courts to regulate the practice
> of attorneys permitted to practice before them.  *See* 11 U.S.C. §
> 105(a) and 2 *Collier on Bankruptcy* ¶ 105.04[7][b] at p. 84.4 - 84.6
> (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005).
> *McGahren v. First Citizens Bank and Trust Co. (In re Weiss)*, 111
> F.3d 1159, 1171 (4th Cir. 1997), *cert. denied*, 522 U.S. 950, 118 S.
> Ct. 369 (1997)  ("A federal court also possesses the inherent power
> to regulate litigants' behavior and to sanction a litigant for bad-faith
> conduct.", citing and quoting from *In re Heck's Properties, Inc.*, 151
> B.R. 739, 765 (S.D.W.Va. 1992) ("It is well-recognized, . . . quite
> apart from Rule 9011, that courts have the inherent authority to
> impose sanctions upon counsel who is found to have acted in bad
> faith, vexatiously, wantonly or for oppressive reasons."))

*In re Bowman,* Misc. Proc. No. 07-00701, slip op. at 12-13 (Bankr. W.D. Va. March 31, 2008),

*aff'd*, No. 7:08CV00339, 2010 U.S. Dist. LEXIS 62004, 2010 WL 2521441 (W.D. Va. June 21,

2010), quoted in *In re Circle T Pipeline*, 2011 Bankr. LEXIS 2490 at *39-40.


DISCUSSION

There is no evidence before the Court that Mr. Copeland, or either law firm in which he

is or has been a principal, has ever filed a pleading, written a letter, or made an appearance in

court on behalf of Mr. Bays individually.  Furthermore, while it is no doubt true that Mr. Bays

31

did share with Mr. Copeland information about his personal business affairs, the Court has not found any specific information which was provided that any attorney representing Miners Oil would not have needed to know about the connections between the corporation's obligations and claims and the business and personal affairs of Mr. Bays individually in order to represent the corporation properly in a reorganization case, even indeed just to be able to file accurate schedules of its assets and liabilities.  Mr. Bays in his testimony was unable to point to any specific information provided which the corporation and he individually were not obliged to disclose to the Court and creditors in connection with their respective cases.  Neither was he able to point to any truly confidential information, nor has the Court been able to discern any, that he disclosed to Mr. Copeland which the latter then turned around and used to his prejudice. The Court is further satisfied that Mr. Copeland has provided capable and vigorous representation of the Debtor in this case, which, to say the least, has proved to be a very challenging one.

Neither does the Court perceive that Mr. Copeland violated any ethical obligation owing to Mr. Bays.  That follows from the Court's conclusion that no actual attorney-client relationship was established between the two of them.  There is no evidence that Mr. Bays ever expressly asked Mr. Copeland to represent him or that Mr. Copeland expressly agreed to represent him.  Although not determinative, neither is there any evidence that Mr. Copeland ever charged Mr. Bays for any of the conferences which the two of them had or any other legal work he did involving Mr. Bays or his companies, or that Mr. Bays asked or expected to be billed for anything which Mr. Copeland did.  Certainly there was a period of time during which Mr. Bays might have requested that Mr. Copeland represent him personally and suggest some

32

other attorney to represent Miners Oil, but that path was not taken.

The Court concludes that, at most, Mr. Bays was what Rule 1.18 of the Virginia Rules of Professional Conduct governing attorneys terms a "prospective client." An attorney does have a duty to a "prospective client" even when "no client-lawyer relationship ensures,"[19] but it is not, as Mr. Bays would have it, a duty never to take a position adverse to that prospective client, but rather one not to "represent a client with interests materially adverse to those of the prospective client in the same or a substantially related matter if the attorney received information from the prospective client that could be significantly harmful to that person in the matter[.]" Rule 1.18(c). Even in that situation representation is permissible if both the "affected client and the prospective client have given informed consent, in writing" and certain other conditions are satisfied. Rule 1.18(d). In this case, however, Mr. Bays has been unable to point to any information he disclosed to Mr. Copeland which was not being made known anyway in the bankruptcy filings for himself and his company. Just as Mr. Lamie noted in his testimony at the hearing, I have not seen any evidence of any actual injury to Mr. Bays from Mr. Copeland's use of any information which would not have been known to any attorney properly representing Miners Oil in its case. We must not lose sight of the fact that Mr. Bays had multiple capacities in which he was acting. To be sure one of those capacities was Richard Bays as an individual having very substantial financial obligations which he was not in a position to satisfy and having to respond to pressing claims advanced by his estranged wife in a bitter divorce case. Another capacity, however, was as the owner and president of Miners Oil, which also had major obligations to creditors which it was not in a position to satisfy, a

---

[19] Rule 1.18(b) of the Virginia Rules of Professional Conduct.

company which seems to have been the crown jewel of Mr. Bays' business empire and the

failure of which would very likely lead to the loss of all or substantially all of his other business

interests.  In short, Mr. Bays had plenty of incentive to get the best bankruptcy attorney

available to attempt to restructure and save Miners Oil.  The testimony of Mr. Hicok, Mr. Bays'

accountant, at the hearing set forth in persuasive detail the dangers to Miners Oil resulting from

the divorce case and the need as well as the intent, first and foremost, to hire Mr. Copeland to

guide the company through an attempted restructuring in bankruptcy.  So, is that all that needs

to be considered and said?   Regretfully, the Court concludes that such is not the case.

There is no mistaking that Mr. Bays had a genuine feeling that Mr. Copeland had

betrayed him when the latter took actions on behalf of Miners Oil in its capacity as debtor-in-

possession in its case and his individual case which Mr. Bays considered to be adverse to his

interests and wishes.  He seems to have believed that, although he approved Mr. Copeland's

representation of the corporation in its bankruptcy case, such representation would be carried

out to advance what he hoped to accomplish, stated more baldly, that Mr. Copeland would

"have his back" as the popular expression goes, and that the former would act as a sort of

bankruptcy Wizard of Oz to control the course of both the corporate and individual cases for the

overall benefit of Mr. Bays.  The Court does agree with the contention made by Mr. Bieger that

Mr. Bays is estopped to complain that Mr. Copeland ultimately represented the corporation's

fiduciary obligations to its creditors vigorously even when that proved highly objectionable to

Mr. Bays.  That ultimate performance, however, was unknown at the time the cases were filed.

At that time Mr. Bays was in control of Miners Oil and Mr. Copeland was in the awkward

position of having his client's largest debtor being not only its president but also its sole

shareholder.  What the course of the two cases might have been, if the corporation's creditors

had not decided to become actively involved with very vigorous and capable representation of

their own to force Mr. Bays out of the management of his own corporation, is unknowable.  The

plain fact, though, is that such active creditor participation forced the hands of both Mr. Bays

and Mr. Copeland and brought home to them quickly that they no longer were managing events

but rather were having to respond to the actions taken by others, specifically, the United States

Trustee, the Creditors' Committee, and some large unhappy creditors, all of such parties being

very well represented.  More pithily, they filed the corporate case playing offense, but very soon

were having to play defense against some potent adversaries.

In retrospect and under careful scrutiny the shortcomings of counsel's disclosure of a

"connection" to Mr. Bays are not difficult to discern.  The most striking aspect of that

disclosure is that, although it does say that there is a "connection" to Mr. Bays, it discloses

precious little about the actual nature of that "connection."  It simply states that Mr. Bays is the

"principal" of the Debtor, that he lives in Washington County, Virginia, and that he is

represented by separate counsel, Mr. John Lamie, as if that ended any further consideration of

how the Debtor's counsel might be affected by the unexplained connection to Mr. Bays.  The

information provided, while true, does nothing to make the Court aware of how intertwined the

business affairs of the Debtor and Mr. Bays were, that he was not only its "principal," but also

its largest debtor.  It gives no hint that the very filing of the case was substantially related to the

divorce case in which Mr. Bays was involved, nor of the tremendous size of the aggregate debt

owing to Miners Oil by the several convenience stores of which he was the majority owner.

More important than any of these circumstances, however, as potentially affecting the firm's

35

"disinterestedness," was the fact that Mr. Bays had been intimately involved in the discussions

with Mr. Copeland leading up to the decision to file the corporate case, that his personal

representation by Mr. Lamie followed rather than preceded his initial conferences with Mr.

Copeland and the decision to put the corporation into bankruptcy, and that Mr. Copeland had

made the recommendation that Mr. Bays retain Mr. Lamie and had made the initial contact with

the latter on Mr. Bays' behalf.  These facts, at least in summary form, were what was needed to

apprise the Court fully as to the nature of the "connection" between the firm and Mr. Bays

which might affect the independence of the former from the influence of the latter and therefore

its sole loyalty to the interests of Miners Oil and its creditors without regard to the personal

interests and wishes of Mr. Bays.


DECISION

I have taken more time considering this case than is my usual practice because it has

been difficult to arrive at a decision which seems satisfying as being both correct in its

application of the governing legal principles and fair.  Certainly no creditor has voiced any

support for the Objection and the United States Trustee, who has not been at all reluctant to

challenge Mr. Copeland's Chapter 11 representation in other cases, has stated on the record, by

counsel, that she does not join in the Objection.  So there seems to be a consensus that the firms

have earned most, if not all, of the compensation sought in this case.  I recognize that Mr.

Copeland had to make decisions on the fly at the same time as he was dealing with a myriad of

issues associated with the filing and prosecution of this case, not to mention innumerable other

time pressures and demands which are part of the reality of a very busy bankruptcy legal

practice.  In contrast I come along two years later in the cool of the evening and with all the

time I have thought necessary to review his actions under a microscope as it were.  I have not

found any reported decision which closely mirrors the facts presented here as I have determined

that Mr. Copeland never represented Mr. Bays personally and that he did not use any

confidential information which the latter provided to him to the latter's detriment.  Even so, I

have concluded that Mr. Copeland's disclosure was inadequate and that the principle involved

is so critical to the proper functioning of the bankruptcy system that it must be upheld even, or

perhaps especially, in cases having hard facts.  The applicable rules are well known to Mr.

Copeland as he has been a very active bankruptcy attorney for over thirty years and during that

time has filed and handled numerous Chapter 11 cases.  Indeed he was involved, either as

counsel for the debtor-in-possession or for some other party in interest, in all four of my prior

decisions dealing with these matters which have been reviewed in an earlier portion of this

opinion.  The critical principle involved is that the disclosure of an attorney's "connections"

with parties in interest must be sufficiently detailed so that any issues potentially affecting the

disinterestedness of counsel or his undivided loyalty to the debtor-in-possession (or other

trustee) are brought to the attention of the United States Trustee and the Court.  Here Mr.

Copeland recognized, correctly, that he did have a "connection" to Mr. Bays, but then only

noted facts which would not raise any concern about Mr. Bays having any influence over

counsel's independence and objectivity.  Indeed the facts which were disclosed are such as to

cause one to wonder why Mr. Bays had been listed as a "connection" in the first place.  I

conclude, as I did in the *Five Forty Park Corporation* case earlier quoted, that the disclosure

which was made left the Court "with a materially incomplete and misleading understanding of

37

the nature of [the firm's] pre-petition involvement" with Mr. Bays as not just the Debtor's "principal" but also its largest debtor and such individual's various conferences with Mr. Copeland prior to his being represented by separate counsel.  Another very important fact was the strong connection between the filing of the Miners Oil petition and the acrimonious divorce case in which Mr. Bays was then involved.  These are the kind of facts that would prompt the Court and the United States Trustee to perk up their ears and consider whether it was possible for any attorney who had been involved so deeply in these discussions and the decision to file the case to be able to be free of the influence of the personal factors at play in this bankruptcy.  Such a disclosure would likely have resulted at least in serious discussions between counsel and the United States Trustee and more likely a hearing at which the situation might have been fully explored before making the decision whether to approve the firm's employment.  This is not by any means to say that the firm's employment would not have been ultimately approved, but rather that any such approval, if that were determined appropriate, would have occurred with all of the cards on the table and after a careful review of the situation which satisfied the Court that the firm could be wholly independent of the pressures associated with the many daunting problems facing Mr. Bays.  Such an examination might well have caused the firm to pause and think through the implications of filing the adversary proceeding against Ms. Bays or, at the very least, the timing of doing so at such an early stage of the case as the only proceeding of its kind being filed, and whether this was being done because it gratified Mr. Bays or was likely to provide real benefit to the restructuring of Miners Oil.

I conclude that no persuasive showing has been made that the legal services involved with the adversary proceeding against Ms. Bays provided a benefit to Miners Oil.  The burden

of making such a showing, especially in a situation such as this one where the Court had

expressed on the record its concerns about the motivation for filing the action against Ms. Bays,

rests on the individual or entity seeking allowance of compensation for doing so.  I further

conclude that such proceeding was filed without proper review and consideration by counsel of

its prospects at that time to actually advance the Debtor's restructuring or sale.  Accordingly, I

have decided to disallow compensation in the amount of $3,237.59 associated with those

services.[20]  This disallowance is separate and apart from any disallowance as a result of the

disclosure issue.

What action I should take with respect to that disclosure issue has proved to be the most

difficult question to decide.  I recognize that Mr. Copeland's extensive Chapter 11 experience

as counsel for many debtors-in-possession and his history of involvement in the cases resulting

in the Court's prior decisions which have already been reviewed in this opinion could justify a

very serious sanction against his firms, even up to disallowance of all compensation.  I believe

that some judges might well reach that result, especially considering that absent the filing of the

Objection the Court almost certainly would never have had occasion to know what had

transpired between Mr. Bays and Mr. Copeland in connection with the decision to file this case.

There are, however, factors weighing towards a much more modest sanction.  The Court would

---

[20] The Court notes that during the final stages of the editing and review of this decision
before its release Mr. Copeland filed on behalf of the estate administrator for Miners Oil a more
particularized version of this adversary proceeding against Ms. Bays seeking recovery of
compensation allegedly paid to her for which no services were actually rendered and other
payments for her benefit which it is claimed provided no benefit to the corporation.  The Court's
action in disallowing compensation to Copeland & Bieger for the services related to the filing of
the original proceeding for the reasons noted above should not be taken as expressing any view
on the merit of the newly filed proceeding.

identify those factors as being:

     1.  The timing of the filing of the Objection only after very substantial legal services had been rendered.

     2.  The very difficult and vigorous representation provided by Mr. Copeland to Miners Oil as debtor-in-possession after the removal of Mr. Bays from management of the corporation, even in the face of Mr. Bays' quite evident displeasure, and the creditors' satisfaction with those services.

     3.  The possibility that the Court's ruling in the *Circle T Pipeline* case might have given a misleading signal to Mr. Copeland as to what the Court would accept as sufficient disclosure of the circumstances surrounding a disclosure of a "connection" to a party in interest other than the debtor.  Even though in that decision, as already noted above, I specifically cited the *Leslie Fay Cos.* case and discussed the obligation of an attorney seeking approval of employment as counsel for the debtor-in-possession to disclose "[a]ll facts that may have any bearing on the disinterestedness of a professional", I denied a motion filed by the United States Trustee to vacate the order approving Mr. Copeland's employment on the ground that his disclosure of a "connection" to Mr. Sturgill failed to reveal relevant facts concerning that connection which might affect counsel's disinterestedness, the same general issue which is presented in this case. So, why does a different result follow here?  There are several reasons.  First, in that case the "connection" related to advice given to the corporation's accountant and guarantor of some of its loans, not to the person in control of the debtor and the person to whom counsel would answer.  Second, the accountant had recognized that Mr. Copeland could not represent both him and the corporation in a bankruptcy case and on his own initiative had sought out separate

counsel to represent him in the case.  Third, the motion was filed at an early stage of the case

and management of the Chapter 11 debtor client at a hearing on the United States Trustee's

motion had voiced its strong support of Mr. Copeland and desire that he continue to represent it

in the bankruptcy case, so to have granted the motion would have deprived the debtor of its

desired legal counsel to handle its reorganization case.  Fourth, my assessment that the facts in

question there would not have changed my decision to approve employment.  Fifth, the fact that

in that case Mr. Copeland had attempted to raise with the United States Trustee even before

filing the case the issue of his earlier advice provided to Mr. Sturgill, which was indicative of an

intent to disclose, not to conceal or intentionally "abbreviate[] his disclosures."  Sixth, the

explanation I provided in the *Circle T Pipeline* opinion as to the basis for that decision ought to

have served as fair warning to counsel that while the disclosure there was less than it ought to

have been, that inadequacy would not be used under the particular circumstances presented

there as a basis to disqualify him from representing the debtor.  I expressly noted in that

decision, however, that, under other facts, my analysis would be quite different.

I conclude that some sanction is necessary to make the message clear that failure to

provide full disclosure of the relevant circumstances potentially affecting an attorney's

disinterestedness and reasonably raising a question about the existence of any divided loyalty

on the part of counsel between a debtor-in-possession or other trustee and any other party in

interest in the case will have consequences.  It could lead to disallowance of all compensation.

Under the challenging facts presented here, I conclude that disallowance of $8,500 of the net

fees which otherwise would be approved, which here means the balance of total fees sought

after disallowance of the fees associated with the adversary proceeding filed against Ms. Bays,

is the best balance I can devise between enforcing the rules and providing fairness to Mr.

Copeland and his firms.  The disallowance of compensation associated with the adversary

proceeding will be charged against the final application of Copeland & Bieger.  The $8,500

disallowance will be assessed against both final applications (as supplemented) pro rata.  No

issue has been raised about the expenses claimed and they will be allowed in full.

An Order in accordance with this Memorandum Decision allowing (1) the final

application of Copeland & Bieger, P.C. in the total amount of $101,134.50 comprised of

$98,694.61 for fees (disallowing $7,352.85 + $3,237.59) and $2,439.89 for expenses, and (2)

the final application of Copeland Law Firm, P.C. in the total amount of $17,529.19 comprised

of $15,902.85 for fees (disallowing $1,147.15) and $1,626.34 for expenses, but otherwise

overruling the Objection filed by Mr. Bays, will be entered contemporaneously herewith.

DECIDED this 3rd day of December, 2013.

_____
UNITED STATES BANKRUPTCY JUDGE